[No. 26284. Department One. January 16, 1937.]

THE STATE OF WASHINGTON, *Respondent* v. J. T. HULL et al., *Appellants*.[1]

*Warren Hardy, J. E. Bakken,* and *J. T. Haggarty,* for appellants.

*Warren G. Magnuson* and *Paul Coughlin,* for respondent.

GERAGHTY, J.—The appellants were charged jointly by information with the crime of burglary in the second degree, and found guilty by the verdict of a jury. After the denial of motions for a new trial by the court, each was charged by supplemental information

[1]Reported in 64 P. (2d) 83.

with being an habitual criminal. A separate verdict of guilty upon this charge was returned against each. The jury found specially that appellant Arthur had twice previously been convicted of felonies, and appellants Neal and Hull had each once previously been convicted of a felony. The court then imposed sentences, committing Arthur to the state penitentiary for the term of his natural life, and Neal and Hull each to the state penitentiary "for the term of not more than the term of his natural life."

At the trial of the burglary charge, the defense of the appellants was a plea of entrapment. Appellant Neal, testifying, said that he had served a term in the state penitentiary for robbery of the Bon Marche department store, in Seattle. He had resided in Seattle for twenty-five years, and served on the police force until 1921. He was acquainted with Ed Hagen, a former member of the police force.

In the early part of November, 1934, Hagen asked him if he wanted to make a little money. He told Hagen he was on parole, and did not want to do anything to violate it. Hagen urged that he had a safe, good proposition that would run around six or seven thousand dollars, probably more. Neal met Hagen two days later at a down-town corner, where Hagen explained about four different places where he thought it would be possible to get someone to go down and burglarize. Among the places mentioned was the Wonder Bread Bakery.

Neal still insisted that he would not violate his parole, and would not take any chance. Hagen assured him that police protection could be had. Neal asked him who would furnish protection. Hagen answered Lieutenant Mahoney, a member of the department. He then told Hagen that if a meeting were arranged with Mahoney, he would talk to him. Neal said that he later

met Mahoney, who told him there were two safes at the Wonder Bakery, "one safe had nothing in it, and the other one did;" that right after the first of the year there would be more money in it than at any time before, on account of collections, and that they had better wait until the first Saturday after the first of the year. The officer suggested the entry on Saturday night because there would be only one man working at that time.

Neal testified to an agreement as to the division of the money between the persons interested: That twenty-five per cent of the money in the safe would be divided between Hagen and Mahoney, ten per cent to Hagen and fifteen per cent to the officer. Mahoney told him to give his share to Hagen.

Neal told Mahoney he would not do it himself, but would see if he could get somebody who would. He interested appellant Hull, to whom he explained the information he had received and his conversation with Hagen and Mahoney. He told Hull he did not think there would be any "double crossing," and that everything would be all right. Hull said he wanted to be sure and would see for himself. Neal arranged for a meeting between Officer Mahoney and Hull. Afterwards, Hull told him he thought it was all right. Hull then introduced Thomas, who was later shot and killed while participating in the burglary. Hull also introduced the appellant Dale Arthur. Neal, Hull, Thomas and Arthur held a conference on a down-town street, in which the plan of the robbery was discussed, as well as the share going to Hagen and Mahoney.

The bakery was entered about one o'clock on the morning of January 5, 1935. The appellants with Thomas had gone to the bakery the three preceding Saturday nights for the purpose, as Neal testified, of inspecting the premises. On the night of the bur-

glary, they remained outside waiting for the night engineer to come to work. When he arrived at the bakery, they seized and bound him and, also, the Japanese porter, who had come to open the door in response to a ring by the engineer. Arthur was left below in charge of the two bound men. Neal, Hull and Thomas then proceeded toward the office upstairs, where the safe was.

Six policemen had been "planted" to watch the bakery,—Mahoney and another in the bakery office, two in a nearby school, and one in an apartment house. As the three approached the office, the police fired. Thomas, who was in front, was instantly killed. Appellants Neal and Hull were injured, but escaped from the building. Arthur was wounded and taken on the premises. Later, Hull and Neal were apprehended in a house south of Seattle, where they had taken refuge. Appellants Arthur and Hull corroborated Neal's testimony as to the alleged entrapment.

The theory of the defense was that Mahoney did not intend to protect the appellants, but beguiled them into the commission of the crime for the purpose of improving his own standing in the police department by their apprehension.

After a categorical denial by Officer Mahoney of the testimony of appellants, the state called Captain Yoris of the Seattle police force as a witness. He testified that the first information received by the police department of the intended burglary came to him, and was given by him to Justus, then chief of the detective force. He denied that the information had been given him by Mahoney and said it had come to him from two sources outside the police department; that Chief Justus of the detectives had sent a detail of officers to watch the bakery on three successive Saturday nights preceding the night of the burglary, and that

Mahoney was not detailed to the earlier bakery plants because he was then occupied with the Bremerton murder case. Later, Captain Yoris having become acting chief of the detectives, Mahoney was given charge.

■ Cross-examined by one of the attorneys for appellants, Yoris declined to give the names of the persons from whom he had received the information of the intended burglary, basing his declination on the ground that the information had come to him in confidence and was privileged. The court refused to require him to answer. This refusal of the court is the principal error assigned by the appellants.

The applicable rule is stated by Wigmore:

"A genuine privilege for communications, on the fundamental principle of privilege (*ante*, § 2285), must be recognized for the communications made by informers to the Government; because such communications ought to receive encouragement, and because that confidence which will lead to such communications can be created only by holding out exemption from a compulsory disclosure of the informant's identity:

"This privilege is well established, and its soundness cannot be questioned." 5 Wigmore on Evidence, § 2374.

The author states, however, that the rule is subject to certain inherent limitations, one of these being that

"Even where the privilege is strictly applicable, the *trial Court may compel disclosure,* if it appears necessary in order to avoid the risk of false testimony or to secure useful testimony."

It would seem that whether or not disclosure will be required is largely discretionary with the trial court, and its ruling will not ordinarily be disturbed. In *Goetz v. United States,* 39 F. (2d) 903, the circuit court of appeals, fifth circuit, held that it was not error

for the trial court to refuse to compel government officers to give the name of their informant, citing Wigmore, *supra,* as well as Underhill's Criminal Evidence (3rd ed.), § 287, and Roscoe Criminal Evidence, p. 179.

The record here does not warrant the conclusion that there was an abuse of its discretion by the court in refusing to require Yoris to disclose the names of his informants.

■ Another error assigned by the appellants is the failure of the court to give requested instructions Nos. 1 and 2 on the issue of entrapment. Instruction No. 8 given by the court is as follows:

"You are instructed that it is not unlawful for the officers of the law to employ and use others to investigate or aid in the investigation of suspected offenses against the laws of this state, but it is not proper, even during an investigation, to entice or persuade anyone contrary to his own will or inclination, to violate the laws of this state.

"In this connection you are further instructed that under the law of this state decoys may be used for the purpose of entrapping criminals, and that it is permissible for the officers to lay a trap to detect one in the act of committing a crime. And such person who falls into such trap and thus does by reason thereof commit a crime, can be convicted therefor. But when the criminal design originates not with the accused but is conceived in the mind of the officers of the law, and the accused is by persuasion or inducement lured into the commission of a criminal act, and the intent to commit such act did not originate in the mind of the accused except as it was suggested to him by the officers, or their agents, the state is estopped by sound public policy from prosecuting the accused therefor."

In this single instruction, the court sought to combine the two requested instructions. The instruction of the court, for the most part, embodies the language

of the requested instructions of appellants, in fact is a verbatim copy of most of them. The principal complaint of appellants is directed to the last sentence of the instruction of the court, quoted above, for its failure to state in so many words that, if the jury found the appellants had been entrapped, the state could not "successfully prosecute the accused, and you must acquit." It seems to us that, when the court charged the jury that, if they found the appellants had been entrapped, "the state is estopped by sound public policy from prosecuting the accused therefor," there was no room left for doubt in the minds of the jurors as to what the court meant.

In any event, the contention of the appellants is without merit for the further reason that the language they criticise was employed by themselves in one of their two requested instructions.

Finding no error in the record, the judgment will be affirmed.

STEINERT, C. J., MILLARD, MAIN, and BLAKE, JJ., concur.